TAYLOR W. FOX, P.C.
Attorney for Defendant
AZ State Bar No. 019780
Two N. Central Avenue, Ste. 735
Phoenix, AZ  85004
Tel.: (602) 443-2220
Facsimile: (602) 443-2221

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>    v.<br><br>Brittany Ann Parrish,<br><br>    Defendant | No. CR-08-00256-06-PHX-SMM<br><br>**OBJECTIONS TO DRAFT PRESENTENCE INVESTIGATION REPORT** |

NOW COMES the Defendant, by and through undersigned counsel, and pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure hereby objects to various portions of the draft presentence report.

Respectfully submitted this 17th day of March, 2010.

s/Taylor W. Fox
Taylor W. Fox

**OBJECTIONS**

I. **"Offense Conduct"**

    A. **Page 3, Para. 4**

Defendant objects to the characterization that part of the scheme involved real estate properties purchased at "greatly inflated prices". That description suggests that the real estate appraisals were in some way manipulated as part of the conspiratorial scheme. However, since the inception of this case there not been any claim, nor evidentiary support for a claim, that the actual appraisals were fraudulently crafted. The four real estate transactions for which Ms. Parrish received any proceeds from their sales were appraised at values that supported the "bubble" market that existed at the time. The traditional practice of lenders demanding a particular appraiser from its own list of approved appraisers further diminishes any claim that the appraisers did anything other render an at-the-time accurate valuation of the involved properties. Lastly, including Mrs. Parrish as someone who was "in the know" about the particular loan and valuation details would be misleading; the extent of Mrs. Parrish's involvement in this matter was introducing one straw buyer (Mrs. Bredenburg) to co-defendant Lucero, and then setting up an LLC to receive a portion of the proceeds from the sale of several properties arranged by Ms. Lucero.

**B.   Page 3, Para. 5**

This paragraph describes Mrs. Parrish as notarizing loan documents "knowing the documents contained false or misleading information about the straw buyers". This description refers to part of Mrs. Parrish's conduct described in the indictment regarding her notarization of various loan applications involving Deborah Bredenburg, one of the straw buyers. In her duties as notary public Mrs. Parrish was responsible only for verifying the identity of the signatory (Mrs. Bredenburg); she neither reviewed the loan documents for the validity or accuracy of their information, nor was she (as notary public) expected to do so.

This paragraph also refers to Mrs. Parrish and the co-defendants working "with appraisers so the properties were appraised at an inflated value." Mrs. Parrish objects to this characterization for the same reasons set forth in paragraph (A) above. There is no evidentiary support that Mrs. Parrish ever worked, to any degree, with any appraisers related to the real estate transactions of which she was a part.

**C.   Page 5, Para. 8**

The presentence report states that "all properties have been foreclosed." Mrs. Parrish objects to that statement to the extent that it claims that all involved properties were sold at trustee sales. Of the four properties with which Mrs. Parrish had a direct involvement—the 5166 W. Muriel Drive; 4349 N. 86th Street;

7731 S. 22nd Lane; and 5013 N. 87th Place—only three ever had a notice of trustee's sale recorded (Exhibit 1). One of them—the N. 86th Street property—had a notice of trustee's sale recorded twice.

## II. "Culpability Assessment"

### A. Page 5, Para. 10

This paragraph includes the following statement: "[Lucero] showed Parrish how to recruit straw buyers and what to list on the loan applications to ensure the lender approved the loans." The first portion overstates the degree of sophistication involved in Mrs. Parrish's "recruiting" efforts—which in her case was limited to one straw buyer who Mrs. Parrish had met while working as a loan officer. The second part misstates the extent of Mrs. Parrish's involvement. Mrs. Parrish had no control over any of the loan applications, nor did she assist in the preparation of the four previously mentioned properties.

### B. Page 6, Para. 14

Mrs. Parrish respectfully disagrees with the characterization that she set up an LLC to "hide" the proceeds. She acted with no specific intent to hide any money she received. Indeed, the HUD-1 statements list her LLC as a recipient of additional settlement charges. It also describes Mrs. Parrish as recruiting multiple

straw buyers, when in fact there was only one (Ms. Bredenburg) who Mrs. Parrish introduced to co-defendant Lucero.

Mrs. Parrish also objects to the calculated loss amount of $829,500, for reasons set forth in greater detail below.

Mrs. Parrish also objects to the characterization that she used a "special skill" as a loan officer to facilitate the real estate transactions. The loan applications were handled from start to finish by other co-defendants. Mrs. Parrish's loan contribution to the conspiracy was introducing Ms. Bredenburg to co-defendant Lucero, who then employed her as a straw purchaser for the four residences mentioned above. In doing so, Mrs. Parrish utilized no particular special skill.

Lastly, Mrs. Parrish objects to the $116,050 calculated "cash back" amount she received. The indictment describing the various money wire remittances received by various defendants revealed Mrs. Parrish receiving three separate wire transactions totaling $101,050.00.

### III.  "Base Offense Level"

#### A.  Page 7, Para. 22 (Calculated Loss)

Mrs. Parrish disputes the presentence report's calculation of a base level of 25. The PSR writer awarded Mrs. Parrish a 14-level enhancement based on a

calculated loss amount of $829,500. The defense has not been given any documents from the lenders or the mortgage companies substantiating loss. To the best of defense counsel's knowledge, the only basis for loss calculation being employed by the government is the difference between the fraudulent contract sales price and the eventual re-sale purchase price that the lender obtained at the trustee or REO sale that followed. Applying such a basis for determining loss would be inappropriate, for several reasons.

"Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. §2B1.1 n. 3(A)(i). A court can estimate loss. *See Id*. n. 3(C) ("The court need only make a reasonable estimate of the loss"). "The guidelines do not present a single universal method for loss calculation under §2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Volp*, 479 F.3d 715, 718 (9th Cir. 2007).

Although the guidelines do not specify an appropriate valuation date to calculate loss, the Ninth Circuit has supported using a valuation date at the time of the actual fraud. In *U.S. v. Crandall*, 525 F.3d 907 (9th Cir. 2008) defendant was convicted of wire fraud and other felony counts related to the purchase of apartments and fraudulent conversion into condominiums. *Id.* at 909-911. At sentencing defendant argued that the buyers of the condos suffered no losses because they were worth more at the time of trial than when the buyers purchased

them from the defendant. *Id*. at 911. The district court rejected this argument and imposed a loss calculation based on the sales price of the condominiums the defendant sold. *Id.* The Ninth Circuit reversed and remanded on the loss calculation, finding that it was not reasonable because of the value that the condominiums had at the time they were purchased. *Id*. at 913. It went on contemplate the scenario in which loss "cannot be reasonably determined, given the nature of the property involved in the fraud." *Id.* at 915. In such situations the Court advised that a district court should turn to §2B1.1 Application Note 2(B), which instructs loss calculation based on the gain resulting from the offense." *Id.* The Court went on to caution against using the real estate market as a basis for loss calculation. *See I*d. n.8 ("[T]he actual loss to the victims at the time of the fraud, as opposed to the time of trial or sentencing*,* best captures Defendant's culpability. ***The volatile nature of the real estate market is wholly independent of Defendant's actions*** and, for sentencing purposes, they should not benefit from the ultimate conversion of the units into condominiums") (emphasis supplied).

      The only appraisals done on the properties at or near the time of the fraudulent transactions were those that supported the respective loan amounts. Because of the wholly independent nature of the real estate market, the cataclysmic disintegration of that market beginning in approximately 2007 should not be considered as part of the actual loss to the lenders in 2006.

Loss calculation complications further arise in this case because of the initial mortgage payments some of the lenders received. The draft PSR refers to the payments Mrs. Parrish initially made. Those payments would need to be calculated in assessing actual loss. *See U.S. v. Allison*, 86 F.3d 940, 942-943 (9th Cir. 1996) (holding that district court improperly calculated loss based on total amount defendant fraudulently charged to credit card, without consideration to payments defendant had previously applied toward the balance).

Other circuit courts have refrained from using the difference between the original loan amount and the eventual foreclosure sale for loans that were sold to successor lenders. In *U.S. v. James*, 592 F.3d 1109 (10th Cir. 2010), the defendant pled guilty to wire fraud and another felony count, both related to a scheme to fraudulently obtain mortgage loans of twenty residential properties involving ten lenders. *Id*. at 1111. Specifically, the defendant searched for homes for sale, obtained overvalued appraisals for them, and recruited straw buyers to submit loan applications containing materially false statements. *Id*. After initially making payments on some of the mortgages, the defendant could not keep up with the terms of the loans, eventually resulting in the foreclosure of all the homes. *Id*. Prior to sentencing many of the lenders had sold the loans to other loan servicers. *Id*.

Prior to sentencing the government argued for a loss calculation based on the difference between the loan and the foreclosure sales price of all properties). *Id.* After the court ordered the parties to calculate the actual loss suffered by the lenders, the government contacted the lenders. *Id.* The lenders gave varying replies: some gave actual monetary figures, while others did not know the amount of their actual loss. *Id.* The government never provided any evidence regarding the amount that the original lenders received from the successor loan servicers, nor how much the original lenders gained or lost from the sales. The presentence report adopted the loss calculation advocated by the government. *Id.* Defense counsel objected via a written pleading, contending that the public foreclosure and real estate records were inadequate to determine the total loss suffered by the original lenders. *Id.* at 1112. He went on to elaborate on the deficiencies of the loss calculation method employed in the PSR:

> Many of these properties were purchased using a first mortgage and a home equity loan (HELOC) as a second mortgage. The total amount financed is reflected in the chart as a combined number for both loans. The property records do not reveal the amount recovered for each mortgage. Nor do the records account for the loans that were sold by the original lenders or the effect of mortgage insurance, payments by the borrowers before default, rents received by the lenders prior to the sales or other income or expenses related to the defaults.

*Id.*

At sentencing defense counsel suggested using the defendant's actual gain as an alternative loss calculation method. *Id*. The court rejected this and instead adopted the PSR's loss calculation based on the difference between the loan amounts and the foreclosure sale prices. *Id*. It refused to consider successor lenders as victims, holding that their losses were not reasonably foreseeable. *Id*. The Tenth Circuit found the district court's loss calculation to be clearly erroneous, holding that the loss calculation employed was ultimately unreasonable in light of the uncertainties surrounding the money that the successor lenders had paid the original lenders. *Id.* at 1115-16.

In this matter there is a dearth of evidence regarding the compensation that the original lenders received from the successor lenders. In light of the conclusion in *Crandall* that the volatility of the real estate market operates independently of defendant's conduct, counsel suggests that the most reasonable alternative calculation of loss in this matter would be actual gain.[1]  *See also U.S. v. Zolp,* 479 F.3d 715, 720-722 (9th Cir. 2007) (finding clearly erroneous district court's loss

---

[1] The indictment describes a $101,050 gain Mrs. Parrish obtained through wire transfers. In light of the plea stipulation to a restitution calculation between $200,000 and $400,000, Mrs. Parrish respectfully requests that the loss amount and restitution imposed be the low end of that range, given that her actual gain was less than $200,000. that loss calculation would result in a 12-level, not 14-level, enhancement.

calculations in a "pump and dump" stock fraud case in which district court deemed "valueless" the stocks after the fraud "came to light").

### B. Page 7, Para. 22 (Enhancement for Number of Victims)

Ms. Parrish strongly objects to a four-level enhancement based on a casual conclusion that this mortgage fraud matter involved more than 50 victims. Intuitively speaking, there cannot be fifty financial victims, in light of the forty-three counts in the indictment itself. Further, the reasonably foreseeable losses were limited in Mrs. Parrish's case to the four residential sales with which she was involved. Although a defendant can be accountable for reasonably foreseeable conduct arising from fellow co-conspirators, Mrs. Parrish's specific conspiratorial universe was limited to co-defendant Lucero, and co-defendant Bartlemus (who was the escrow officer involved in some of the transactions). The other real estate transactions listed in the indictment did not benefit, assist in, promote, or facilitate the four real estate transactions from which Mrs. Parrish profited. The only co-defendant with whom Mrs. Parrish was directly involved in the fraudulent transactions was April Lucero, to whom she introduced the eventual straw purchaser for all four properties. Consequently, the only reasonably foreseeable victims for Mrs. Parrsish would have been the original lenders involved in the four properties. Consequently, no enhancement for number of victims should be awarded.

### C. Page 7, Para. 22 (Base Offense Level Calculation)

Mrs. Parrish objects to the base offense level calculation in the draft presentence report. The report calculates it to be Level 25. For the reasons set forth in paragraphs A and B above, Mrs. Parrish asserts that the base offense level is 19.

### IV. Adjustments for Role in Offense

Mrs. Parrish objects to the claim that Mrs. Parrish utilized a "special skill, her position as loan officer" (Draft PSR, P. 8, para. 25). A person can receive a 2-level upward adjustment if she employs a special skill "in a manner that significantly facilitated the commission or concealment of the offense". U.S.S.G. §3B1.3. "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing". *Id*. n. 4.

As the discovery disclosed by the government supports, Mrs. Parrish introduced a straw purchaser to the co-defendant who drafted and submitted the loan applications and HUD-1 statements. Mrs. Parrish did not broker the real estate deals. She did not handle the loan applications. She did not arrange the appraisals. She did not sign any of the documents relating to the four properties. She did not navigate the straw purchaser through the loan application and HUD-1 statements. Mrs. Parrish set up an LLC because that was what her co-defendant

was doing in order to receive the cash out proceeds to a corporate entity, and had at one point advised Mrs. Parrish to do the same. Acting at the advice and with the guidance of a co-defendant does not constitute use of a special skill; indeed, if a special skill were involved Mrs. Parrish would not have copycatted her co-defendant's LLC set-up. Therefore, no upward adjustment is warranted.

Additionally, Mrs. Parrish believes a 2-level reduction is warranted for minor role in the offense. A court can authorize a 2-level downward adjustment if there is a finding that the defendant was a minor participant in any criminal activity. U.S.S.G. §3B1.2(b). A court can only impose a mitigating role adjustment if there is more than one culpable individual involved in the commission of the offense. U.S.S.G. §3B1.2 n. 2. Further, the adjustment can only be imposed for defendants whose conduct makes them substantially less culpable than the average participant. *Id*. n. 3(A). "Minimal participant" is defined as those "who are plainly among the least culpable of those involved in the conduct of a group." *Id.* n. 4. "Minor participant" is one who is more culpable than a minimal participant but less culpable than most other participants. *Id*. n. 5.

A defendant's culpability is to be measured "against his co-participants, not a hypothetical 'average participant'". *United States v. Petti*, 973 F.2d 1441, 1447 (9th Cir. 1992).

Measuring Mrs. Parrish's culpability against those of her co-defendants, Mrs. Parrish was a minor participant. She introduced one straw purchaser to a co-defendant, and received a monetary benefit for doing so. She did not submit the fraudulent documents on which the lenders relied in releasing the loan money. She did not coordinate between and among the buyers, sellers, lenders, and title ompanies to facilitate the house sales. Once she introduced her one straw purchaser to co-defendant Lucero, she essentially had no additional involvement in the transaction, other than creating an LLC to which her portion of the cash out proceeds were received.

## V.     Adjusted Offense Level (Subtotal)

For the reasons set forth above Mrs. Parrish objects to the draft PSR's calculation of 27, and instead asserts it to be 17.

## VI.    Paragraph 21:  "Total Offense Level:  21"

For the reasons set forth above, Mrs. Parrish's sub-total should be Level 14.

Respectfully submitted this 17th day of March, 2010.

    s/Taylor W. Fox
    Taylor W. Fox

Copy of the foregoing mailed, faxed or hand delivered this 17th Day of March, 2010, to:

The Honorable Stephen M. McNamee
U.S. District Court Judge
District of Arizona
401 W. Washington
Phoenix, AZ 85003

Kevin Rapp
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central, Suite 1200
Phoenix, Arizona  85004-4408

Justine Kozak
U.S. Probation Officer
401 W. Washington
Phoenix, AZ 85003

    s/Taylor W. Fox
    Taylor W. Fox