# TAYLOR W. FOX, P.C.

Attorney for Defendant
AZ State Bar No. 019780
Two N. Central Avenue, Ste. 735
Phoenix, AZ  85004
Tel.: (602) 443-2220
Facsimile:  (602) 443-2221

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-08-0256-006-PHX-SMM |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| Brittany Ann Parrish, | |
| Defendant | |

NOW COMES the Defendant, by and through undersigned counsel, and pursuant to 18 U.S.C. §3553 respectfully submits this Memorandum for consideration regarding sentencing in this matter.

Respectfully submitted this 23rd day of March, 2010.

/s/ Taylor W. Fox
Taylor W. Fox

# MEMORANDUM

## I.     FACTS

On April 26, 2007 agents with the Federal Bureau of Investigation contacted Defendant Brittany Parrish at Achievers Mortgage (her place of employment at the time).  They questioned her regarding her involvement with the sale of several homes that had involved the same purchaser—a woman named Deborah Bredenburg.  During the interview Ms. Parrish acknowledged knowing co-defendant April Lucero through previous employment.  Mrs. Parrish told the agents that in April 2006 co-defendant Lucero's husband had called Ms. Parrish and "proposed this great deal" to her:  in exchange for Mrs. Parrish finding a straw purchaser with good credit to be an investor in real estate, Mrs. Parrish would have the properties deeded in the name of an LLC that Mrs. Parrish would create.  This was the same system that Mrs. Lucero had in place.  A portion of the equity would be withdrawn and remitted at closing to both Mrs. Parrish's and Mrs. Lucero's LLCs.  That equity would then be used to make mortgage payments on the houses until they could be rented out or re-sold (Exhibit 1).

In response, Mrs. Parrish introduced Mrs. Lucero to Deborah Bredenburg, a woman who Mrs. Parrish had helped qualify for a re-financing loan through

Achievers.  Ms. Bredenburg agreed to serve as a "straw purchaser"[1] on four residential properties, in exchange for which she was to receive a $5,000 check per residential sale.  Mrs. Lucero handled the actual loan application with Ms. Bredenburg.  After making the introduction, Mrs. Parrish set up an LLC.  She then submitted invoices to the title company for real estate consulting fees.  Once the properties were sold to Ms. Bredenburg Mrs. Lucero and Mrs. Parrish received wire transfer amounts from the proceeds of the sale.   Mrs. Parrish received total wire transfer amounts of over $100,000.  Some of the money initially went toward the mortgage payments on some of the homes.  One of the four homes (the Muriel address) was the residence of Mrs. Parrish and her family at the time of her April 2007 FBI interview.

## II.   The Federal Statutory Factors for Consideration at Sentencing

Until five years ago a district court was required to sentence a defendant convicted of a federal offense to a sentencing range set forth by the United States Sentencing Guidelines ("Guidelines").  18 U.S.C. §3553(b)(1).  In 2005 the U.S. Supreme Court invalidated the "mandatory" language of that portion of §3553,

---

[1] This is the term of art being used because of its inclusion in the charging document.  However, at the time of her interview FBI agents had to explain to Mrs. Parrish the definition of "straw buyer" because she was unfamiliar with the term.

holding that it was incompatible with the Sixth Amendment right to a jury trial determination of any fact that enhanced a sentence. *United States v. Booker*, 543 U.S. 220, 248-49, 259 (2005). Under current federal sentencing law any applicable Guidelines range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence". *United States v. Ameline*, 400 F.3d 646, 655-656 (9th Cir. 2005). Post-*Booker* sentencing proceedings still must adhere to the goals set out in 18 U.S.C. §3553(a)(1)-(2), which include:

> The nature and circumstances of the offense and the history and characteristics of the defendant as well as the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training and medical care.

*Ameline, supra, at* 656. There is no rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range:

> We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.

*Gall v. United States,* 128 S.Ct. 586, 595 (2007). Although *Gall* permitted an appellate court to "presume" the reasonableness of a within-Guidelines-range sentence, the 9th Circuit has expressly declined to do so. *United States v. Carty*, ---

F.3d ---, 2008 WL 763770 (9th Cir. Ariz. 2008).  The Court of Appeals elaborated on that decision:

> The overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

*Id.*

A district court judge deciding to impose an outside-Guidelines sentence does not abuse discretion simply because of a disparity between the justification for the deviation and extent of that deviation; rather, that is "simply *a* relevant consideration."  *Id.*  When a party "raises a specific, non-frivolous argument tethered to a relevant §3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position."  *Id.* (*citing Rita v. United States,* 551 U.S. ---, 127 S.Ct. 2456, 2468 (2007).

III.   **RELEVANT SENTENCING FACTORS FOR CONSIDERATION**

A.   **Nature and Circumstances of the Offense**

If the more than thirty properties listed in the indictment Mrs. Parrish was involved in four[2].   She introduced one straw purchaser to Mrs. Lucero.  She set up an LLC that was listed on the loan application documents.  She submitted invoices to the title companies so that she could receive the wire transfers.

During her interview by the FBI Mrs. Parrish informed the agents that she "asked very few questions about how the deal actually worked."  The discovery submitted by the government reflects the accuracy of that statement.  Aside from the invoice submitted in the name of her LLC and the money orders given to Ms. Bredenburg, Mrs. Parrish's name and/or signature are absent from the loan application documents and title records.  To put it succinctly: Mrs. Parrish introduced Mrs. Bredenburg, and was paid (in separate wire transfers) for doing so. While this certainly does not provide a legal justification for her conduct, the evidence supports Mrs. Parrish's statements to FBI agents when she told them that

---

[2]  The indictment describes one of Mrs. Parrish's overt acts to include notarizing loan documents for the Liberty Lane property containing false or misleading information.  However, because her role as notary was limited to simply ascertaining the identity of the signer of the documents, Ms. Parrish had no occasion to review the accuracy of the content itself.

she relied to a great extent on the work and advice of others in the structuring and execution of these fraudulent transactions.  Mrs. Parrish did not review the loan applications that Mrs. Bredenburg filled out, and therefore was not familiar with the specific false statements or avowals that were made.  However, Mrs. Parrish does admit constructive knowledge of the fraudulent loan application content, given that by late 2006/early 2007 Mrs. Parrish was aware of multiple high-value properties that Ms. Bredenburg had improbably purchased through several home loans.  Given Mrs. Parrish's awareness of Ms. Bredenburg's modest financial status at the time, Mrs. Parrish was aware that the loan documents had to have been "fudged" in some way in order to facilitate approval of those loans.

### B.     History and Characteristics of the Defendant

As reflected in her criminal history record in the draft presentence report, Mrs. Parrish is a 38-year-old woman with no significant criminal activity in the last eight years.  The criminal record she does have reflects no white collar fraud-related conduct.  Since age twenty-six all but one criminal incident was traffic-related.

The myriad character letters previously submitted to the U.S. Probation Office reveal a kind, caring mother and friend whose greatest priority is in caring for Layla, her youngest child.  As Mrs. Parrish describes in her letter to this Court,

her day-to-day life has become centered on work and taking care of her youngest daughter. Additionally she helps shoulder the responsibility of her 15-month-old grandson on the weekends and some weekday evenings (thereby enabling her daughter to work).

Mrs. Parrish's current employment record reflects her commitment to providing for her family. Mrs. Parrish takes great pride in her current employment as an independent contractor sales representative with StarLines USA. In a letter dated March 15, 2010, the President of StarLines U.S.A. describes Mrs. Parrish as a "model" independent contractor. In addition to her work with Starlines Mrs. Parrish does data entry in the evenings for a different company.

### C.   Providing Adequate Deterrence to Criminal Conduct

The two-year specter of felony federal charges has itself provided more than adequate deterrent effect on Mrs. Parrish. She suffers from anxiety for which she is currently being prescribed Xanax and Xoloft, according to a prescription submitted to defense counsel dated November 23, 2009. Her current criminal proceeding has obviously enhanced the anxiety for which she has received treatment for the past six years.

**D.     Protecting the Public from Further Crimes**

The circumstances of this case likely will not be duplicated in Mrs. Parrish's lifetime.  She was provided an opportunity to make money off of real estate transactions at a time in which all participants believed that the profits from these homes sales were infinite, and that no one would suffer an economic loss.  The abrupt and cataclysmic implosion of the real estate market proved them all wrong.

Simply put, the combination of circumstances leading to Mrs. Parrish's conduct had no historic precedent in this country, and will likely not be capable of duplication—certainly within Mrs. Parrish's lifetime.  In light of this, and in light of Mrs. Parrish's conduct over the last three years, supervised probation will ensure that Mrs. Parrish continues doing what she has been doing for some time—working and providing for her family.

**E.     Unwarranted Disparities in Sentencing**

The current PSR Guidelines range estimate of 51 to 63 months would create an unwarranted disparity in this matter.   On March 23, 2010 co-defendant Adorno was sentenced to time served followed by five years of supervised release.  According to the indictment Mrs. Adorno received over $180,000 in fraudulently obtained wire transfers.  Her listed overt acts included setting up an LLC to receive the wire transfers from various home sales, having a

straw buyer quit claim a property to her LLC, and knowingly possessing a stolen and fraudulently endorsed check.  Mrs. Parrish's culpability in this conspiracy does not surpass that of co-defendant Adorno; yet sentencing Mrs. Parrish to a prison term greater than time served would impose a sentence as if she was.

## IV.   CONCLUSION

A district court's "statutory charge" regarding sentencing is to impose a sentencing sufficient, but not greater than necessary, to advance the §3553 factors. This overarching principle warrants a sentence that would balance punishment and provide treatment (successful completion of which would further serve the public's future interests).  If probation with incarceration is deemed inappropriate by this Court, counsel for Mrs. Parrish believes that no more than 3 years of probation would best fulfill the collective sentencing goals.

Respectfully submitted this 23rd day of March, 2010.

/s/ Taylor W. Fox

Taylor W. Fox

1

Copy of the foregoing mailed, faxed or hand
delivered this 23rd day of March, 2010, to:

2

3

The Honorable Stephen M. McNamee
U.S. District Court Judge
District of Arizona
401 W. Washington
Phoenix, AZ 85003

4

5

6

Kevin Rapp
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central, Suite 1200
Phoenix, Arizona  85004-4408

7

8

9

10

Justine Kovak
U.S. Probation Officer
401 W. Washington
Phoenix, AZ 85003

11

12

13

14

Respectfully submitted this 23rd day of March, 2010.

15

/s/ Taylor W. Fox

16

Taylor W. Fox

17

18

19

20

21

22

23

24

25